# Exhibit A



September 24, 2016
Centers for Medicare & Medicaid Services

*RE: CMS 1695-P, Medicare Program; Hospital Outpatient Prospective Payment and Ambulatory Surgical Center Payment Systems and Quality Reporting Programs; Proposed Rule, July 31, 2018*

To Whom It May Concern:

On behalf of the patients and staff of Sarasota Memorial Hospital (SMH), I appreciate the opportunity to comment on the provisions contained in the Centers for Medicare & Medicaid Services's (CMS) calendar year (CY) 2019 Hospital Outpatient Prospective Payment System (OPPS) Proposed Rule. 83 Fed. Reg. 37046 (July 31, 2018). SMH strongly opposes CMS's proposals to: (i) exclude from OPPS payment those services provided by an excepted off-campus provider-based department (PBD) that were not part of a "clinical family of services" that the PBD provided during a baseline period covering November 1, 2014 through November 1, 2015; and (ii) cap the OPPS reimbursement rate for evaluation and management (E/M) services provided by excepted off-campus PBDs to the amount of the newly blended rate for E/M services CMS recently proposed under the Medicare Physician Fee Schedule (MPFS). As a legal matter, these proposals are contrary to statutory authority, are not supported by substantial evidence, and are otherwise arbitrary and capricious. But much more importantly, these proposals, if adopted, would visit serious harm to safety net hospitals like SMH that are often the only source of care for underserved populations.

SMH is a public hospital owned by the Sarasota County Public Hospital District. As the only nonprofit hospital in Sarasota County, Florida, SMH provides a wide range of high-risk, high-cost safety net services, including obstetrics, neonatal intensive care, pediatric, and psychiatric services for patients of all ages. Recognizing that good care extends beyond the hospital campus, SMH has also established a network of outpatient facilities and provider-based urgent care centers located throughout the community that serves Sarasota's growing population and provides on-site radiology, laboratory, and pharmacy services that are not typically found in freestanding physician offices. In addition to improving the community's access to care, our off-campus PBDs help address the costs associated with serving as the county's sole provider of safety net services by offering a lower-cost alternative to the costly emergency room setting.

As stated in comments to CMS's proposals in the CY 2017 OPPS Proposed Rule, which are attached here as **Exhibit 1**, SMH strongly believes that CMS continues to mischaracterize the majority of off-campus PBDs as hospital acquisitions and conversions of freestanding physician practices that previously furnished services under the MPFS only to become hospital departments offering the same services but paid at the OPPS rate. The Sarasota County Public Hospital District includes a separate non-profit 501(c)(3) entity that employs 61 primary care physicians, 62 specialty care physicians and 39 non-physician practitioners, all of whom are enrolled in Medicare Part B and paid under the MPFS. None of these physicians' practices has been established as or converted to PBD status and paid under the OPPS. They remain physician offices and clinics reimbursed pursuant to the MPFS.

Rather, SMH established PBDs to provide necessary services that are not commonly provided by Part B physicians in our community, such as radiology, bone density, mammography, ultrasound, nuclear medicine, CT scan, MRI, cardiopulmonary rehab, cardiac rehab, anti-coagulation, a COPD clinic, a heart failure clinic, and, most importantly, urgent care services. Urgent care, in particular, is one of SMH's most significant outpatient service lines because it fills a significant gap between physician offices that offer limited services during

1700 South Tamiami Trail   Sarasota, Florida   34239-3555
941-917-9000   www.smh.com

limited hours, and costly hospital emergency departments. Many patients treated at SMH's urgent care departments are referrals from community physicians that do not offer sutures, incisions, draining procedures, EKGs, IVs, or foreign body removal. SMH's PBDs are constantly evolving to meet the medical needs of our growing – and aging – patient population. CMS's proposal to limit service line changes at excepted off-campus PBDs will handcuff our ability to offer resource-intensive services that Sarasota-area physician practices do not offer. Not only do physician offices not offer these services, they also do not operate at the extended hours that SMH's excepted PBDs operate.

SMH's urgent care departments are open twelve hours per day (8:00 a.m. to 8:00 p.m.), seven days a week, every day of the year except Thanksgiving Day and Christmas Day. During flu season, SMH extended its urgent care hours even further to 7:00 a.m. to 10:00 p.m. Most community physician offices are typically only open from 8:00 a.m. to 4:30 p.m. Monday through Friday. Most physician practices have large panels of established patients, making it difficult for even longstanding patients to make same-day appointments. The odds of getting an appointment for new patients or visitors are even lower. SMH established its urgent care departments as a direct response to these gaps in access as local physicians showed no desire to fill these needs. Not surprisingly, SMH treated 17,102 total out-of-state patients during the peak visiting season of January-March 2018, a four-fold spike over summer months (3,280 out-of-state patients from July-September 2017).

This dynamic is exactly why OPPS reimbursement is critical to our excepted PBDs. These departments offer a variety of specialized services for extended hours each day. By contrast, independent physician offices maximize their schedules by squeezing in as many short, relatively low-complex visits into a given day. They do not offer advanced specialized services because they can only treat so many patients in a short time period. The "availability cost" – i.e., the cost necessary to maintain long hours for specialized services that very few patients may utilize on any particular day or even a season – is too great for a physician office to bear. But the need for these services and hours is still present in the community, and SMH has filled that gap. Limiting OPPS reimbursement for any new specialized services that SMH's excepted PBDs may want offer in the future increases the likelihood that they will not be offered in these departments at all.

To make matters worse, SMH's service area is in the midst of an increasing physician shortage that will further limit patient access. As described in **Exhibit 2**, the greater Sarasota area projects an acute physician shortage by 2020 that will coincide with a significant increase in our Medicare-age population. The Sarasota area itself continues to expand as former ranch and agricultural properties are developed into new housing communities. As a public hospital

with an exceptional reputation for quality, SMH is the first provider many of these new residents seek out. This population will require additional services and, as a result, our facilities must have the flexibility to offer these services to them. SMH simply cannot build enough parking garages and facilities on its landlocked campus to accommodate this growth. These patients must continue to be treated in our urgent care and other excepted departments throughout the community.

And CMS must provide payment for services furnished at these locations at the rate full OPPS prescribed by Congress in order for safety net hospitals to ensure access to such services. It is simply not enough for CMS to blithely state that its proposals do not prevent patients from being treated in outpatient hospital settings. The agency simply ignores the effect that these proposals will have, on patients and the facilities they seek out for care, in favor of an unsubstantiated fear. CMS's belief that it needs to deploy additional tools to curb hospital acquisitions of physician practices – when it has provided <u>no new information or data</u> showing that such acquisitions continue apace – is simply inappropriate when the biggest trend in physician practice is a wave of retirements hitting just as the Medicare population is about to swell.

In addition, CMS's proposals to reduce payments to excepted departments for E/M services will result in an annual estimated impact to SMH of $3.7 million, as documented in **Exhibit 3**. Again, these services are not typical physician office services. SMH's excepted urgent care centers offer a wide array of services that physician offices simply do not provide, an often a complex E/M code is billed for such encounters. Reducing E/M payment rates for excepted departments dramatically erodes SMH's ability to provide services to this growing and aging patient population and will instead have the likely effect of <u>increasing</u> more costly visits to the ED. In fiscal year 9/30/18 to date, SMH treated 31,745 total patients who were either seasonal residents or out of state or foreign tourists; 1,511 were inpatient admissions with the remaining being outpatient visits. These patients do not have regular primary care physicians in the area and face two choices for care: our urgent care centers or hospital emergency rooms. Indeed, 84 percent of SMH's non-state patients are seen in either the ED or in our provider-based urgent care; of these encounters, 70 percent are seen in urgent care departments. Even with the significant shift in lower-acuity services that SMH has managed to shift out of the ED and into its urgent care departments, volumes and wait times in our ED remain high, especially during peak tourist and visiting seasons. Any change that would potentially shift even more volume back to the ED is untenable for patients seeking true emergency services.

For the reasons set forth below, SMH urges CMS to abandon its proposals on these issues. These proposals are the product of implausible readings of the relevant statutory authority, and are not supported by substantial evidence in CMS's rulemaking record. If adopted, each will result in significant harm to patients treated by safety net providers like SMH.

I. **CMS's Proposal to Deny OPPS Reimbursement for "New" Clinical Services at Excepted PBDs Is Contrary to the Statute and Lacks any Reasoned Basis**

The Supreme Court has made clear: "If the statutory language is plain, we must enforce it according to its terms." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015). As the D.C. Circuit noted in *Loving v. I.R.S.*, 742 F.3d 1013, 1016 (D.C. Cir. 2014), "[n]o matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, whether the agency has stayed within the bounds of its statutory authority." Consistent with these principles of statutory interpretation, the plain language of Section 603 of the Bipartisan Budget Act of 2015 (BBA15) does not permit CMS to adopt this proposal.

CMS concedes that "there is no congressional record available" for Section 603. 83 Fed. Reg. at 37148. But the agency cannot use the absence of legislative history to rewrite a statute to suit its policy goals when the plain language of that statute does not support it. CMS believes that Congress's intent in passing Section 603 was to limit the establishment of new off-campus PBDs, apparently concerned that hospitals had a repeated practice of acquiring freestanding physician clinics, "flipping" them to PBD status while offering no new services or otherwise distinguishing the clinics from their previous status, and simply pocketing the difference in OPPS reimbursement over the MPFS rate. *See, e.g.,* 83 Fed. Reg. at 37147. SMH strongly objects to this characterization because it is not supported in any statutory authority nor, in SMH's case, is it supported by fact. Moreover, it ignores repeated statements by CMS recognizing the important and unique role played by PBDs—something that Congress certainly would want to preserve, and did though enactment of Section 603, in a meaningful way. *See, e.g.,* OIG Rep. No. OEI-04-97-00090 at 27 (Aug. 2000) ("The provider-based program is a critical part of [CMS's] program that does increase beneficiary protections. We also believe that provider-based entities can improve access to care. In fact, many provider-based entities provide services that are enhanced relative to free-standing entities and that are virtually identical to those provided in the main portion of the hospitals."); 73 Fed. Reg. 66187, 66193 (Nov. 7, 2008) (recognizing that outpatient hospital payment rates are appropriately higher than payments to freestanding sites because of "the high facility overhead expenses that are associated with the delivery of services unique to an outpatient hospital or department of an outpatient hospital."). But even if one were to concede that CMS has accurately captured Congress's intent, and SMH does not, CMS has strayed well beyond the statute to essentially halt hospitals in their tracks from offering new clinical innovations and treatments. This was not Congress's intent as evidenced by the plain language of Section 603 itself.

Section 1833(t)(1)(A) of the Social Security Act requires CMS to pay for "covered OPD services" under the OPPS. When it enacted Section 603, Congress excluded from the definition of covered OPD services those "applicable items and services" provided by "an off-campus outpatient department of a provider." 42 U.S.C. § 1395l(t)(1)(B)(v). Congress then defined "applicable items and services" as all "items and services other than items and services furnished by a dedicated emergency department." *Id.* § 1395l(t)(21)(A). Thus, the impact of Section 1395l(t)(1)(B)(v) on an "off-campus outpatient department" is substantial and broad. Unless it is a dedicated ED, then literally all of the "items and services" the off-campus department furnishes must be paid under a reimbursement methodology other than the OPPS. The converse is also true; if OPD services are furnished by an outpatient department that is *not* "an off-campus outpatient department of a provider," then Section 1833(t)(1)(A) still applies, and the Secretary is required to pay for

those OPD services under the OPPS. *Id.* § 1395l(t)(1)(A) ("With respect to covered OPD services ... the amount of payment ... *shall be determined under a prospective payment system....*") (emphasis added).

Congress, of course, excluded from the definition of "off-campus outpatient department of a provider" a department of a provider ... that was billing under this subsection with respect to covered OPD services furnished prior to" November 2, 2015. 42 U.S.C. § 1395l(t)(21)(B)(ii.). Therefore, Congress clearly intended that the Medicare program continue to pay for services furnished by an excepted off-campus department under the OPPS.

CMS's proposal to limit OPPS payment for excepted off-campus departments to clinical families of services that were billed under the OPPS prior to November 2, 2015 rewrites the exception language in Section 1395l(t)(21)(B)(ii). There, Congress defined "off-campus outpatient <u>department</u> of a provider" and excluded from that definition "a <u>department</u>" that was billing for OPD services prior to November 2, 2015. In drafting this definition, Congress chose precise language to define which facilities would be included and excluded from Section 603's broad mandate—and therefore which would continue to receive OPPS reimbursement and which would not. The language Congress chose focused on "departments of providers", not the "items and services" billed by those departments. In other words, it is the "off-campus outpatient <u>department</u>" that is either excepted or not excepted. CMS's proposal ignores this language and rewrites Section 1395l(t)(21)(B)(ii) to read that a department that was billing for OPD services prior to November 2, 2015, "but only for those types of services billed by the department prior to that date." Section 1395l(t)(21)(B)(ii) includes no such qualifying language.

Moreover, Congress did include language that limited Section 603's reach to certain types of "items and services." In Section 1395l(t)(21)(A), Congress defined the "items and services" to which Section 603 is applicable to <u>not</u> included items and services furnished by a dedicated emergency department. If Congress wanted to limit OPPS payment to a subset of services furnished by an excepted off-campus outpatient department, it could have easily done so in the definition of "applicable items and services." Just as Congress excluded emergency department services from Section 603's reach, it could have also defined "applicable items and services" to not include services that were of the type furnished by an excepted off-campus department prior to the date of enactment of Section 603.[1]

---

[1] Congress originally considered limiting the "items and services" exception to a select group of codes representing a subset of verifiable emergency services (CPT Codes 99281-99285) but rejected that approach in favor of exempting all services provided by qualified emergency departments. *See* Bipartisan Budget Act of 2015, Discussion Draft, *available at* https://docs.house.gov/billsthisweek/20151026/BILLS-114hr-PIH-BUDGET.pdf at 36. This decision shows that Congress was fully aware of the possibility of making exemptions based on a category of services rather based on the status of the facility as an outpatient department of a provider. But, significantly,

CMS attempts to blur the distinction between "excepted departments" and "applicable items and services" by stating that Congress identified both "excepted departments" and "excepted items and services." This is false: Congress never used the phrase "excepted items and services." The only category of services that Congress identified in Section 603 are "applicable items and services" that no longer meet the existing statutory definition of "covered OPD services." If a facility is not an "off-campus outpatient department of a provider" then it does not furnish "applicable items and services;" it furnishes "covered OPD services" that remain OPPS-reimbursed. Nothing in Section 603 gives CMS the ability to further transform covered OPD services furnished at an excepted PBD into "applicable items and services" just because they happened to be furnished after to November 1, 2015.

CMS's proposed policy rewrites the statute, but by doing so, CMS exceeds its delegated authority as the agency cannot simply nullify the specific department-based exemption that was enacted by Congress under Section 1395l(t)(21)(B)(ii). *See Lamie v. United States Trustee*, 540 U.S. 526, 537 (2004) ("there is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted"). By broadly defining what items and services would be affected by Section 603, Congress also broadly defined those services that are not subject to Section 603.

Congress's incorporation of the Medicare provider-based regulation, 42 C.F.R. § 413.65, in effect at the time that Section 603 was enacted, supports the conclusion that Congress intentionally framed the reach of Section 603 in terms of "departments" and not the "items and services" furnished by those departments prior to enactment of Section 603. 42 C.F.R. § 413.65(a)(2) provides:

> Department of a provider means a facility or organization that is either created by, or acquired by, a main provider for the purpose of furnishing health care services of the same type as those furnished by the main provider under the name, ownership, and financial and administrative control of the main provider, in accordance with the provisions of this section. A department of a provider comprises both the specific physical facility that serves as the site of services of a type for which payment could be claimed under the Medicare or Medicaid program, and the personnel and equipment needed to deliver the services at that facility. A department of a provider may not by itself be qualified to participate in Medicare as a provider under § 489.2 of this chapter, and the Medicare conditions of participation do not apply to a department as an independent entity. For purposes of this part, the term "department of a provider" does not include an RHC or, except as specified in paragraph (n) of this section, an FQHC.

The first sentence of this regulatory definition makes clear that the term "department of a provider" refers to a "facility or organization" for the "purpose of furnishing healthcare services of the same type as those furnished by the main provider." Therefore, at the time Section 603 was enacted, a "department of a provider" could expand clinical services at

---

Congress chose not to implement those narrower service-based exemptions under Section 1833(t)(21), including as applicable to excepted off-campus PBDs that previously billed under OPPS.

that facility and still be deemed as part of the "department of a provider" for legal and regulatory purposes (provided the clinical and financial integration requirements were met) so long as the department is providing services "of the same type" offered by the main provider. In fact, CMS has made clear that a change in services did not require notification or constitute a change in circumstances that might affect the facility's status as a "department of a provider." The regulation defines a "material change" that would require such a notification as "any material change in the relationship between [a main provider] and any <u>provider-based facility or organization</u> such as a change in ownership of the facility or organization or entry into a new or different management contract <u>that would affect the provider-based status of the facility or organization</u>." 42 C.F.R. § 413.65(c) (emphasis added).

That was the state of the law on the day that Congress adopted Section 603, and Congress expressly incorporated that interpretation into Section 603. 42 U.S.C. § 1395l(t)(21)(B). The only substantive change made by Section 603 was that those "off-campus" outpatient departments of providers that did not bill for OPPS services prior to November 2, 2015 cannot be paid for "applicable items and services" under the OPPS. There is no language in Section 603 that suggests that Congress intended to change this long-standing interpretation of Section 413.65(a)(2) such that a change in services would now render the PBD no longer a "department of a provider."

CMS ignores both this critical language and in Section 413.65 and its longstanding interpretation and instead focuses on the reference to "personnel and equipment needed to deliver the services at the facility" contained in the next sentence of the regulation. But that reference to personnel and equipment standing alone does not nullify the meaning of the first sentence which makes the determination of the department of a provider turn on whether it offers the "same type of services" as the main facility. The language cited by CMS merely stands for the straightforward and uncontroverted point that the personnel and equipment, as well as the specific physical facility, of the department must be integrated with and under the control of the main provider consistent with the terms of the provider-based regulation. CMS itself has previously recognized in adopting provider-based requirements that "the provider-based rules do not apply to specific services; rather these rules apply to facilities as a whole." 67 Fed. Reg. 49982, 50088 (Aug. 1, 2003). The plain language of Section 603 adheres to, and incorporates, that commonsense understanding of "department of a provider," and thus clearly entitles off-campus, excepted PBDs to continue receiving OPPS-based reimbursements for all services they provide, even those added following enactment of Section 603.

We urge CMS to reconsider its proposal as Congress deliberately legislated in a manner that sought to limit new PBDs from being able to qualify for OPPS reimbursements, but preserved the ability of existing PBDs that previously billed under that system to continue operating and receiving OPPS rates for **all** "applicable items and services." The plain language of the statute is clear and unambiguous on that point, and CMS must faithfully implement Congress's directive accordingly.

### A. It Would Be Arbitrary and Capricious for CMS to Finalize the Proposed Services Based Restriction Based on the Existing Factual Record

In addition to the serious concerns noted above about CMS's statutory authority to impose any proposed services-based restriction on excepted PBDs, SMH does not believe that CMS's proposed policy is based on any meaningful evidence demonstrating the harm that CMS is attempting to address, and would in fact indiscriminately and arbitrarily punish many institutions such as SMH that are simply trying to deliver care in the most effective manner to their patients. As part of its obligations to act in a reasoned manner, CMS must "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted). CMS's proposal fails to satisfy these basic tenets of administrative law.

First, CMS has impermissibly changed its position without offering any reasoned basis for doing so. When it previously declined to finalize a services based restriction, CMS explicitly noted the need to gather additional data and evaluate that data before imposing any lines of services restrictions. "[W]e intend to monitor service line growth and, <u>if appropriate</u>, may propose to adopt a limitation on the expansion of services or service lines in future rulemaking." 81 Fed. Reg. at 79707 (emphasis added); *see also* 82 Fed. Reg. at 59388 ("we stated that we would continue to monitor claims data for changes in billing patterns and utilization"). To help with these data collection efforts, CMS even created new modifiers, "PO" and "PN," that hospitals were required to report to assist CMS's "efforts to begin collecting data and monitoring billing patterns for off-campus PBDs." 83 Fed. Reg. at 37148. The Proposed Rule offers no analysis of how CMS's review of billing patterns show a continued trend of vertical consolidation that now requires additional restrictions on hospital outpatient services that the agency believed were not necessary only two years ago. CMS offers no explanation for this dramatic change in its approach.

An agency may not "depart from a prior policy sub silentio or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Instead, an agency must provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy," especially where an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy." *Id.* at 515–16. CMS explicitly recognized just two years ago that other changes resulting from Section 603 potentially mitigated any perceived abuses of vertical integration between hospitals and physician practices solely for billing purposes, and that additional data would be helpful to determine whether any additional regulatory restrictions on lines of services were even warranted. *See* 81 Fed. Reg. at 79707 (noting that "relocation policy for excepted off-campus PBDs . . . will help ensure that off-campus PBDs excepted from application of Sections 1833(t)(1)(B)(v) and (t)(21) of the Act will not be able to circumvent applicability of payment under Section 1833(t)(21) of the Act.").

Those same considerations remain equally true today, and yet without providing any data or explanation as to why perceived abuses from vertical integration continue despite these earlier attempts at mitigation, CMS has decided to issue restrictions on lines of services even in the absence of the data that the agency previously deemed critical to its decisionmaking. That abrupt and unexplained change in the agency's thinking fails to comport with reasoned decisionmaking requirements under the APA. Indeed, as explained in **Exhibit 4**, the most recently available claims data that providers have the opportunity to analyze is for CY 2016 claims – claims for services furnished <u>before</u> CMS's implementation of Section 603 took place. The agency and the public simply have no way of knowing if a

proposal to limit service line expansion is "appropriate" when there is no data set to evaluate the effect of CMS's other limitations on relocations and changes in ownership.

Moreover, CMS cannot cure this deficiency by simply releasing the data – if any – that it has relied upon as an accompaniment to its final rule. *See Nat'l Ass'n of Clean Water Agencies v. EPA*, 734 F.3d 1115, 1148 (D.C. Cir. 2013) (recognizing that the very purpose of rulemaking is "to ensure that affected parties have an opportunity to participate in and influence agency decision making . . ."). CMS must "identify and make available technical studies and data that it has employed" in developing its proposed rule. *Connecticut Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982); *see also Time Warner Entm't Co. v. FCC*, 240 F.3d 1126, 1140 (D.C. Cir. 2001) ("[A]n agency cannot rest a rule on data that, in critical degree, is known only to the agency."). "The most critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation." *Owner–Operator Indep. Drivers v. FMCSA*, 494 F.3d 188, 199 (D.C. Cir. 2007). Therefore, in order to satisfy fundamental requirements under the APA, **before** the agency may issue a final rule, CMS must disclose any data in its possession post-dating the enactment of Section 603 that purportedly demonstrates the need for a line of services restriction and allow for public input on that data. *See Shands Jacksonville Medical Center v. Burwell*, 139 F. Supp. 3d 240, 265 (D.D.C. 2015) ("APA . . . require[s] the disclosure of assumptions critical to the agency's decision, in order to facilitate meaningful comment and allow a genuine interchange of views.").

Second, CMS fails to identify *any* evidence that supports the proposed services restrictions for excepted off-campus PBDs. Notably, when CMS originally proposed this policy in 2016, it expressed concerns that "if excepted off-campus PBDs could expand the types of services provided at the excepted off-campus PBDs and also be paid OPPS rates for these new types of services, hospitals may be able to purchase additional physician practices and add those physicians to existing excepted off-campus PBDs." 81 Fed. Reg. at 79706 (Nov. 14, 2016). These same concerns are apparently prompting CMS to re-propose this policy now. *See* 83 Fed. Reg. at 37148. But the only evidence referenced by CMS as documenting this wave of physician acquisitions <u>predates</u> the enactment of Section 603 and the stringent limitations directly imposed by Congress that are already preventing any <u>new</u> off-campus PBDs from receiving OPPS reimbursement for applicable items and services. *See, e.g., id.* (citing to a 2015 GAO report analyzing data from 2007 to 2013). Indeed, the annual MedPAC reports, the GAO report, and other commentary referenced by CMS in the current proposed rule all analyzed data from periods **before** the statutory controls imposed by Section 603 went into effect.

As noted above, CMS previously recognized that other limitations CMS adopted when it first implemented Section 603 would curb the perceived abuses that CMS described. *See* 81 Fed. Reg. at 79707. CMS does not explain why these restrictions, which it previously deemed sufficient just two years ago, are no longer adequate. Indeed, CMS offers no evidence in the current proposed rule that demonstrates that hospital acquisitions and conversions of independent physician practices have continued to increase substantially (or at all) in the aftermath of Section 603 and the policy changes already adopted by Congress and CMS. In the absence of such evidence, it would be arbitrary and capricious for CMS to proceed forward with this services restrictions without any evidence that there is an actual problem needing to be addressed. *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56–57 (D.C. Cir. 2015) ("If an agency fails to examine

the relevant data ... it has failed to comply with the APA."); *see also American Radio Delay League v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) ("It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data"); *Sierra Club v. EPA*, 671 F.3d 955, 965–66 (9th Cir. 2012) (agency's decision was arbitrary and capricious where it failed to consider newer "data [that] told a different story than . . . earlier data" that agency had relied on and where agency failed to provide an adequate explanation for doing so).

Third, not only has CMS has failed to provide any evidence demonstrating the need for the proposed line of services restrictions, it has ignored the significant harms that will result from this policy. Many excepted, off-campus PBDs, including SMH's, will likely need to expand the range of services they provide in the future to meet the needs of their communities. CMS itself recognizes that "community needs may evolve over time," 81 Fed. Reg. at 79707, but dismisses the harms that will result from limiting the range of services provided by excepted off-campus PBDs. That is misguided. The healthcare marketplace is anything but static, and hospitals need the flexibility to respond to changes in technology and patient populations without having to deal with distortions caused by different payment structures depending on the care they provide. Indeed, excepted off-campus PBDs may be far better suited to expand the range of services they provide to efficiently meet the needs of patients, who in the absence of these services, may be left with no recourse other than to visit more expensive emergency rooms at a hospital's main facility. Moreover, excepted outpatient facilities help expand access to care, particularly to underserved communities that may have limited access to transportation or face other barriers to receiving timely medical treatment.

Given these critical services that many excepted off-campus PBDs can offer to patients as healthcare delivery mechanisms continue to evolve, it would be irrational for CMS to adopt an overbroad policy that simply discourages these outpatient facilities from changing their operations to meet changing needs. Indeed, even if there remains substantial growth in vertical integration of physician practices after the changes directly mandated by Section 603—which, as noted above, would be entirely unfounded and speculative on CMS's part—the agency should engage in more targeted measures that would not cause off-campus facilities to discontinue expanding their services altogether. Notably, CMS's change of ownership and location restrictions for excepted facilities just went into effect recently, so it is possible that those added restrictions will achieve CMS's regulatory goals without the need for draconian measures limiting new clinical services altogether. At the very least, CMS should further analyze whether existing measures which continue to be implemented will suffice to address perceived abuses. And if there remain significant concerns as borne out by the empirical data, CMS should consider less invasive solutions that would not indiscriminately punish hospitals like SMH that are merely trying to serve the needs of their communities.

Fourth, trying to identify "clinical families of service" and requiring hospitals (and CMS) to track these newly created categories and to bill appropriately under CMS's proposed dual-track system for OPPS-approved services and non-OPPS-approved services will be tremendously complex and burdensome. That is not simply the belief of SMH and other hospital providers; these very concerns were voiced by CMS two years ago in explaining why the agency decided against finalizing the line of services restrictions. CMS stated: "we agree with commenters, including MedPAC, that our proposed policy could be

operationally complex and could pose an administrative burden to hospitals, CMS, and our contractors to identify, track, and monitor billing for clinical services." 81 Fed. Reg. at 79707. Notwithstanding those concerns, CMS is essentially re-proposing the same policy, including with similar categories for clinical lines of services, but does not offer any explanation of why these administrative burdens and challenges would be any less onerous now. As noted, CMS must provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy, *Fox*, 556 U.S. at 515—something the agency has entirely failed to do here with respect to the enormous regulatory burden that CMS itself has predicted will result under the proposed rule.

### B. CMS Should Not Adopt A Line of Services Restrictions, Nor Any Other Alternative that Would Raise the Same Concerns Described Above

CMS specifically sought comments on other potential methodologies to limit off-campus excepted PBDs from offering new services. Specifically, CMS mentioned a proposal by MedPAC that would impose a hard cap for OPPS eligible services, and once that cap is reached, any additional services provided by excepted by PBDs would be paid for under MPFS. *See* 83 Fed. Reg. at 37149. That proposal suffers from the same flaws described above: namely, there is absolutely no authority for this policy under Section 603; there is no evidence in the record that demonstrates the need to limit additional services provided by excepted PBDs following the existing significant restrictions on outpatient facilities that have already been implemented or are underway; and this policy is overbroad and would deter excepted PBDs from meeting the changing healthcare needs of their communities.

In addition, CMS specifically invited comments on the appropriate baseline period it should use in imposing any line of services restrictions (*i.e.*, in determining OPPS eligible clinical families of services, whether the agency should look at the services provided by the excepted off-campus PBD one year before the enactment of Section 603 of the BBA or a different timeframe such as 3 or 6 months). Again, Section 603 categorically exempts outpatient departments which billed under the OPPS prior to the date of enactment of the statute. The law does not place any temporal limitation concerning which services would continue to qualify for payment under OPPS, whether these services were provided 1 day, 1 year, or 10 years before the adoption of Section 603. Therefore, any limitation on lines of service at excepted off-campus PBDs would exceed CMS's authority, and establishing an even more compressed baseline period (such as 3 months) would only further exacerbate the harms from CMS's unlawful policy.

### II. CMS's Proposal to Cap the OPPS Reimbursement Rate Equal to the MPFS Rate Exceeds the Agency's Statutory Authority and Lacks Any Reasoned Basis

As noted above, Section 603 of the BBA made substantial changes to the reimbursement rates for non-excepted PBDs by subjecting these facilities to reimbursement under the MPFS. Notably, items and services provided by off-campus emergency departments and off-campus PBDs that previously billed under OPPS prior to November 2, 2015 were specifically exempted by Congress from those payment changes. Now, without any intervening change in law by Congress, CMS is seeking to cut the reimbursement rates of E/M services provided by these Section 603-**excepted** PBDs to

equivalent MPFS rate, a change that directly contradicts the legislative framework codified by Congress. Indeed, this new MPFS payment would not merely apply to expanded lines of service, but also to existing E/M services that excepted PBDs were providing prior to the enactment of Section 603—in other words, services that even CMS acknowledges that Congress exempted from the reach of Section 603 and therefore are required to be reimbursed under OPPS. As discussed more fully below, this proposal exceeds CMS's statutory authority and otherwise lacks any reasoned basis.

### A. CMS Lacks the Statutory Authority to Cap the Reimbursement Rate for E/M Services Provided by Excepted PBDs to the MPFS Rate

CMS is "proposing to use [its] authority under Section 1833(t)(2)(F) of the [Social Security] Act to apply an amount equal to the site-specific MPFS payment rate for nonexcepted items and services furnished by a nonexcepted off-campus PBD (the MPFS payment rate) for the clinic visit service . . . when provided at an off-campus PBD excepted from Section 1833(t)(21) of the Act." 83 Fed. Reg. at 37,142. But CMS lacks the authority to impose lower MPFS rates for these statutorily-excepted off-campus outpatient departments.

1. First, Section 1833(t)(2)(F) cannot possibly be read to confer upon CMS nearly unfettered authority to impose payment rates in the manner proposed by the agency. Section 1833(t)(1) requires CMS to establish an OPPS rate structure and apply those rates to covered outpatient department services. Section 1833(t)(2)(F) merely specifies that CMS, in establishing that prospective payment system for covered hospital outpatient services, "shall develop a method for controlling unnecessary increases in the volume of covered OPD services." Notably, that provision was enacted in 1997 and has not previously been interpreted or applied by CMS to afford the agency the authority to deny OPPS reimbursement altogether for medically necessary covered services provided by outpatient hospital facilities and instead subject them to an entirely different MPFS reimbursement scheme.

The D.C. Circuit's opinion in *Hays v. Sebelius*, 589 F.3d 1279 (D.C. Cir. 2009), is directly on point and, in fact, forecloses CMS's efforts to sidestep the statutorily-proscribed OPPS payment structure in reimbursing medically necessary services. In *Hays*, CMS had developed a "least costly alternative policy" and sought to apply this policy to impose a lower reimbursement rate for a covered prescription drug because that drug combined doses of two component drugs that were in the aggregate less expensive. In other words, CMS sought to reimburse the covered drug at a lower amount reflecting the "least costly and medically appropriate alternative" of the two component drugs. The court rejected CMS's approach, finding that the agency "only [had] a binary coverage decision, namely to reimburse at the full statutory rate or not at all." *Id.* at 1281. The agency, however, could not perform "an end-run around the statute" by imposing a different reimbursement rate for the prescription drug simply because there was a potentially cheaper alternative available. *Id.* at 1282. Indeed, the court reasoned that it was highly unlikely that "Congress, having minutely detailed the reimbursement rates for covered items and services, intended

that the Secretary could ignore these formulas whenever she determined that the *expense* of an item or service was not reasonable or necessary." *Id.* (emphasis in original). Similarly, having spelled out in statute the OPPS-based reimbursement methodology for hospital outpatient services, it is unthinkable that Congress intended to allow CMS to freely ignore this methodology altogether whenever there were "unnecessary increases in the volume of covered OPD services." As in *Hays*, to the extent that the services are medically necessary, the mere fact that they may be more expensive in a hospital outpatient setting does not provide license to CMS to ignore the statutory-based OPPS payment formula.

Moreover, CMS's reference to Section 1833(t)(2)(F) does not provide this authority as it would effectively strain any sensible reading of this provision as effectively nullifying the OPPS-based payment scheme for hospital outpatient services. Indeed, when Congress intends to revise the fundamental features of a regulatory regime, it does not "delegate a decision of . . . economic and political significance to an agency" in a "cryptic . . . fashion." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000). "Congress ... does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. American Trucking Association*, 531 U.S. 457, 468 (2001); *see also American Bar Association v. Federal Trade Commission*, 430 F.3d 457, 468 (D.C. Cir. 2005) (rejecting agency's literalist reading of statute regulating "financial institutions" as extending to law firms because the statutory scheme was an "exceptionally poor fit for regulating lawyers"). Given that the basic command of the Medicare statute is that medically necessary covered services must be reimbursed pursuant to the method that Congress prescribes, *see, e.g., Hays*, it is extremely unlikely that Congress also gave CMS the authority to set that command aside and impose an entirely separate and inapt payment scheme with the vague reference in Section 1833(t)(2)(F) allowing the Secretary to develop a "method" to control "unnecessary increases" in "volume." As was the case in *Hays*, courts have been clear that before they will conclude that Congress gave the Secretary the authority to set aside an otherwise clear command to pay a specified rate for items and services, Congress must say so in a straightforward manner.

2. Moreover, any lingering uncertainties about whether Section 1833(t)(2)(F) could be read to provide this specific authority to CMS have been specifically foreclosed by Congress when it subsequently enacted Sections 1833(t)(1)(B)(v) and (t)(21) as part of the BBA of 2015. As noted above, Section 1833(t)(1)(B)(v) specifically excluded from covered outpatient department services those "items and services (as defined in subparagraph (A) of paragraph (21)) that are furnished on or after January 1, 2017, by an off-campus outpatient department of a provider (as defined in subparagraph (B) of such paragraph)." In other words, Congress denied OPPS reimbursement for providers of these non-covered items and services, and thus, as CMS recognizes, "they already receive a MPFS-equivalent payment rate for the clinic visit." 83 Fed. Reg. at 37,142. But, at the same time, Congress specifically exempted certain outpatient departments, including those off-campus facilities that previously billed under OPPS prior to November 2, 2015, effectively ensuring that these facilities would continue receiving reimbursement under OPPS rather than under MPFS or some other payment scheme. *See* Section 1833(t)(21)(B)(ii); *see also* Section 1833(t)(21)(A)(providing items and

services provided by emergency departments are not subject to the restrictions of Section 1833(t)(1)(B)(v)).

CMS clearly does not have the authority to directly overturn Congress's specific legislative choices codified at Sections 1833(t)(1)(B)(v) and (t)(21), nor does the general and undefined statutory language referencing "volume" under Section 1833(t)(2)(F) enacted nearly **twenty** years ago indirectly confer upon CMS that authority. The Supreme Court in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (citations omitted) articulated principles of statutory interpretation that squarely apply here:

> At the time a statute is enacted, it may have a range of plausible meanings. Over time, however, subsequent acts can shape or focus those meanings. The classic judicial task of reconciling many laws enacted over time, and getting them to make sense in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute. This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand. As we recognized recently in *United States v. Estate of Romani*, "a specific policy embodied in a later federal statute should control our construction of the earlier statute, even though it has not been expressly amended."

Here, the "later federal statute" setting forth a "specific policy"—*i.e.*, Section 603 of the BBA exempting certain off-campus outpatient departments from being subject to a non-OPPS reimbursement framework—"control[s]" the "construction of the earlier statute"—*i.e.*, Section 1833(t)(2)(F) and CMS's efforts to rely on that provision to impose MPFS rates on outpatient departments that are plainly exempted under Section 603. Thus, CMS is bound by the express terms of Section 603 and cannot rely on Section 1833(t)(2)(F) or any other similarly "broad" statute to remove the protections granted by Congress to exempt facilities that allow them to continue to receive OPPS reimbursement rates (including for E/M services).

3.  CMS further proposes to implement these unlawful rate changes for excepted off-campus PBDs in a non-budget neutral manner, but that also exceeds CMS's statutory authority. Section 1833(t)(9) specifies that "adjustments," including as to the "relative payment weights" under the OPPS, must be done in a budget-neutral manner. That provision requiring budget neutrality clearly encompasses rate changes such as the substitution of MPFS rates for E/M services instead of the currently paid OPPS rates. CMS tries to circumvent that requirement by arguing that "method[s]" for controlling "volume" increases is not subject to the same budget neutrality restrictions. That reading is unduly narrow, however, and ignores that the "method" for restricting volume increases proposed by CMS is to directly lower rates for selected services, and those sorts of "adjustments" are subject to budget neutrality requirements. If CMS were correct in its reading, the agency could invoke Section 1833(t)(2)(F) to justify the application of every rate reduction for any OPPS service in a non-budget neutral manner and thereby circumvent the budget neutrality requirement in Section 1833(t)(9). Given the express statutory command that "adjustments" be budget neutral, it is unlikely that Congress also implicitly gave CMS the authority to ignore that

command with the vague references found in Section 1833(t)(2)(F). In interpreting the statute at hand, CMS must "read[] the whole statutory text, considering the purpose and context of the statute." *See, e.g., Dolan v. USPS*, 546 U.S. 481, 486 (2006). It is an "essential function of the reviewing court . . . to guard against bureaucratic excesses by ensuring that administrative agencies remain within the bounds of their delegated authority." *Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 655 (D.C. Cir. 1983). Consistent with these authorities, the clear import of the change being proposed by CMS is to adjust the rates paid to outpatient hospital departments for E/M services, and the overall statutory structure and framework make clear that those types of changes must be done in a budget-neutral manner. If anything, CMS's arguments that rate changes implemented through Section 1833(t)(2)(F) are somehow exempt from budget neutrality requirements, whereas rate changes implemented through CMS's other statutory authorities are not so exempted, just underscores that Section 1833(t)(2)(F) does not provide CMS this authority to adjust rates so broadly in the first instance.

### B. It Would Be Arbitrary and Capricious for CMS to Finalize this Rate Reduction for E/M Services Provided by Outpatient PBDs

There are fundamental gaps in the existing factual record, as well as other deficiencies with CMS's proposed policy, that the agency must address before it may implement any proposed rates changes for E/M services provided by outpatient hospital departments.

First, as with the proposed lines of services restrictions, CMS cites to concerns about slowing down the purported unnecessary "shift of services from the physician office to the hospital outpatient department" as its rationale to apply the equivalent MPFS rates to outpatient PBDs. 83 Fed. Reg. at 37,142. But CMS explicitly recognizes that the changes made by Congress under Section 603 "address[ed at least] some of the concerns related to shifts in settings of care and overutilization in the hospital outpatient setting." *Id.* at 37,141. Importantly, none of the data cited by CMS highlighting this significant increase in the utilization of E/M services at outpatient PBDs post-dates the enactment of Section 603 of the BBA. In other words, CMS offers no evidence purporting to demonstrate that there remains any ongoing problem that has not already been adequately addressed through Section 603 and CMS's implementation of those provisions. Notably, CMS required hospitals to report claims data using new modifiers, "PO" and "PN," so that the agency would have a more accurate understanding of whether this shift in location of clinical services remains an ongoing area of concern. As with the proposed line of services restrictions, CMS should first review and analyze those pending data collections, and allow for public comment on those findings, before the agency takes any additional measures such as this proposed rate change. *See Dist. Hosp. Partners*, 786 F.3d at 56–57 ("If an agency fails to examine the relevant data … it has failed to comply with the APA."); *see also American Radio Delay League*, 524 F.3d at 237 ("It is not consonant with the purpose of a rule-making proceeding to promulgate rules on the basis of inadequate data"); *Sierra Club*, 671 F.3d at 965–66 (agency's decision was arbitrary and capricious where it failed to consider newer "data [that] told a different story than . . . earlier data" that agency had relied on and where agency failed to provide an adequate explanation for doing so).

Second, on a related note, the proposed lines of services restrictions and capping of MPFS rates for E/M services both target what CMS perceives to be unnecessary shifts of services from physician offices to outpatient hospital departments. Yet, CMS offers no analysis of how these policies may potentially overlap—*i.e.*, would either of the proposals be sufficient standing alone to address potential unnecessary shifts in services that have not already addressed by the changes directly mandated under Section 603 of the BBA? Simply put, CMS needs to examine the available data to better understand how the marketplace is operating following the restrictions that have already been put in place and then analyze the potential impacts these additional proposed restrictions would have based on **current** market conditions—not the marketplace that existed before Section 603 was enacted.

Finally, it is critical that CMS examine and understand the prevailing state of affairs, because imposing unnecessary and severe restrictions on outpatient departments could impair beneficial technological advancements in the delivery of care and also diminish access to care to all patients. CMS itself states that it "recognize[s] the importance of not impeding developing or beneficiary access to new innovations." 83 Fed. Reg. at 37,143. Well, in order to facilitate those goals, CMS must ensure that any policies further regulating outpatient departments are supported by substantial and contemporaneous data and appropriately account for facilities such as SMH that are actively seeking to better serve their communities.

**Conclusion**

SMH appreciates the opportunity to offer these comments and sincerely urges CMS not to adopt these two proposals.

Sincerely,

*William Woeltjen*

William Woeltjen, CFO

## List of Exhibits

Exhibit 1: SMH's Comments to the CY 2017 OPPS Proposed Rule (Sep. 2, 2016)

Exhibit 2: Navigant Physician Needs Assessment (Jan. 28, 2016)

Exhibit 3: SMH Financial Impact Analysis of E/M proposal

Exhibit 4: Claims Analysis of Service Line Proposal by FTI Consulting

Exhibit 5: Summary of SMH Out of State Patient Visits by Zip Code

Exhibits 5a – 5d: SMH Out of State Patient Visits by Quarter